IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
Case No.: 20-cv-2360520-RAR

**SERENDIPITY AT SEA, LLC**
        **Plaintiff,**

v.

**UNDERWRITERS AT LLOYD'S
OF LONDON SUBSCRIBING TO
POLICY NUMBER 187581,**

**USI INSURANCE SERVICES, LLC,**
        **Defendants**
_____/

## PLAINTIFF'S NOTICE OF CROSS-MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT UNDERWRITERS AT LLOYD'S OF LONDON SUBSCRIBING TO POLICY NUMBER 187581,

Pursuant to Federal Rules of Civil Procedure (FRCP) Rule 56 and Local Rule 56.1 of the United States District Court for the Southern District of Florida, **PLAINTIFF SERENDIPITY AT SEA, LLC** moves this Honorable Court to enter a Summary Judgment in Plaintiff's favor for the relief demanded in its Count I for Breach of Contract, as stated in its Fourth Amended Complaint [ECF No.65]. As and for grounds for its motion states, there are no genuine issues as to any material fact, and that the Plaintiff is entitled to a judgment as a matter of law against Underwriters At Lloyd's of London Subscribing to Policy Number 187581 (hereinafter "Underwriters"). Filed separately, as required by FRCP 56.1, is Plaintiff's Statement of Material Facts. Filed in support of Plaintiff's Motion for Summary Judgment, and contemporaneously herewith, are Plaintiff's Memorandum in Support of Plaintiffs' Motion for Summary Judgment, and the October 30, 2020 Declaration of Captain Scott Connelly.

# **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**   3

**I. INTRODUCTION**   4

**II. PLAINTIFF'S STATEMENT UNDISPUTED OF MATERIAL FACTS**   6

**III. SUMMARY JUDGMENT STANDARD**   6

**IV. LEGAL ARGUMENT - PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT AGAINST DEFENDANT UNDERWRITERS FOR BREACH OF CONTRACT**   6

   **PLAINTIFF DID NOT BREACH THE CAPTAIN WARRANTY BECAUSE IT WAS INVALID AND UNENFORCEABLE DUE TO ITS INHERENT AMBIGUITIES, CONTRADICTIONS AND VAGUENESS**   7

   **PLAINTIFF DID NOT BREACH ANY ASPECT OF THE HURRICANE PLAN BY BRINGING THE VESSEL TO THE BAHAMAS**   12

   **PLAINTIFF DID NOT MAKE ANY MATERIAL MISREPRESENTATIONS IN ITS JUNE 19, 2019 APPLICATION**   15

   **NONE OF THE ALLEGED BREACHES BY PLAINTIFF SERVED TO INCREASE THE INSURANCE HAZARD OF DEFENDANT UNDERWRITERS**   17

**V. CONCLUSION**   18

**List of Exhibits attached hereto:**
1. Warranties
2. Sea Wave Policy
3. Jessica Green Deposition Transcript Deposition taken Sept. 9, 2020
4. John Hewlett Deposition Transcript Deposition taken Sept. 1, 2020
5. Application
6. Affidavit of Captain Scott Connelly dated 5-6-20
7. Affidavit of Captain Scott Connelly dated 10-30-20
8. Email - English to Green
9. Weather Reports
10. Garyfallia Konstanpoulou Deposition Transcript Deposition taken Sept. 2, 2020
11. Rejection Letter
12. Declaration Page
13. Hurricane Plan
14. Underwriters Response to Plaintiff's First Set of Admissions
15. Damage pictures

2

# TABLE OF AUTHORITIES

**Cases**
Ellis v. England, 432 F.3d 1321, 1325 (11th Cir. 2005)
Comer v. City of Palm Bay, Fla., 265 F.3d 1186, 1192 (11th Cir. 2001)
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)
FWF, INC. v. Detroit Diesel Corp., 494 F. Supp. 2d 1342, 1360 (S.D. Fla. 2007)
Welford v. Liberty Mut. Ins. Co., No. 16-14054, at *6 (11th Cir. Nov. 29, 2017
McNulty v. Nationwide Mutual Ins. Co., 221 S2d 208, 211 (Fla. Dist. Ct App. 1969)
Gallagher v. Dupont, 918 So.2d 342 (Fla. 5th DCA 2005)
Haggin v. Allstate Invs., Inc., 264 So. 3d 951 (Fla. 4th DCA 2019)
Talbott v. First Bank Fla., FSB, 59 So. 3d 243 (Fla. 4th DCA 2011)
Ocean's 11 Bar and Grill v. Indemnity Insurance Corporation, RRG, No.11-6157-CIV-ALTONAGA, (S.D. Fla 2012)
Mercury Ins. Co. v. Markham, 36 So.3d 730, 733 (Fla. Dist. Ct. App. 2010)
FWF, INC. v. Detroit Diesel Corp., 494 F. Supp. 2d 1342 (S.D. Fla. 2007)
Empire Surplus Lines v. Chabad House Of North Dade, 771 F. Supp. 2d 1336, 1344 (S.D. Fla. 2011)
Exxon Corp. v. St. Paul Fire & Marine Ins. Co., 129 F.3d 781 (5th Cir. 1997
Mitchel v. Cigna Prop. & Cas. Ins. Co., 625 So.2d 862, 864 (Fla. 3d DCA 1993),
Fireman's Fund Ins. Co. v. Cox, 742 F. Supp. 609, 611 (M.D.Fla.1989), aff'd, 892 F.2d 87 (11th Cir.1989).
Tiara Condominium Ass'n., Inc. v. Marsh, USA, Inc., 991 F.Supp.2d 1271 (S. D. Fla. 2014)
Mitchel v. Cigna Prop. & Cas. Ins. Co., 625 So.2d 862, 864 (Fla. 3d DCA 1993)
Griffin v. Amer. Gen. Life & Acc. Ins. Co., 752 So.2d 621 (Fla. App. 1999).
Washington National Insurance Corp. v. Ruderman, 2013 WL 3333059 (Fla. July 3, 2013)

**Statutes & Rules**
FRCP 56(a)
Local Rule 56.1
Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1381 (Supp. V 1975)
Section 627.409(1) and (2) of the Florida Statutes
FRCP 30(b)(6)
Florida Administrative Rule 69B-220.201
Florida Administrative Rule 4-36.08;

**Other Authorities**
17A AM. JUR.2D Contracts § 707 (2007)
Restatement Of Contracts § 206 (1981)
Miller, D.S., 1988 NAIC Journal of Insurance Regulation
John A. Appleman and Jean Appleman, Insurance Law and Practice section 7386

## I. **INTRODUCTION**

In June 2015, Plaintiff Serendipity at Sea LLC, through its members Michael Sean Oakley and Jacqueline English, applied for a marine insurance policy for their motor-yacht, the M/Y Serendipity, from Wells Fargo Insurance Services (later purchased by Defendant USI) and underwritten by Defendant Underwriters at Lloyd's of London. (Exhibit 5, Insurance Application). The M/Y Serendipity is a 61-foot motor-yacht, a moderately sized boat within the handling capabilities of a single experienced boater. (Exhibit 7 at par. 8, Connelly Affidavit). Mr. Oakley expressed his desire to operate the M/Y Serendipity by himself and submitted evidence of his extensive boating experience to Defendant USI, including his 30 years of boating experience and successful completion of a Safe Powerboat Handling Course. (Id.). In return, Plaintiff was provided a policy which expressly permitted Mr. Oakley to operate the boat by himself. (Exhibit 1, page 7; Exhibit 3, USI's Jessica Green Deposition, 47:1-15 on 9-9-20).

However, the policy also contained a highly ambiguous and contradictory rider, allegedly requiring a captain and crew aboard at all times while the vessel was underway, yet simultaneously permitting Mr. Oakley to be the sole operator of the vessel without anyone else aboard. (Exhibit 1). Notably, Defendant USI's agent/broker also testified under oath that she was not aware of any additional crew or captain requirements in the policy (Exhibit 3, 10:5-6), could not explain the provision herself, and stated that it was her understanding that Mr. Oakley could operate the M/Y Serendipity by himself. (Id. at 47:1-15). Also, of note is that Defendant USI, through its broker/agent, may have failed to provide Defendant Underwriters with knowledge of Mr. Oakley's extensive boating experience and desire to drive his own boat. (Exhibit 3, 67:13-17).

As expressly permitted by both the Policy and Warranty, Mr. Oakley brought the M/Y Serendipity from Florida for a temporary trip to the Bahamas on July 27, 2019, without incident. The subject vessel was securely tied and docked in Paradise Kay in the Bahamas and Mr. Oakley

4

returned to Florida. Then, on August 27, 2019, Hurricane Dorian began forming and was initially predicted to hit Florida. As such, Mr. Oakley believed the M/Y Serendipity to be safer in the Bahamas. (Exhibit 3, Combined Weather Reports). Further, he believed that it would not be safe or reasonable to return to Florida and potentially face the storm in the open sea.

After the storm belatedly changed its path and appeared likely to affect the Bahamas, Mr. Oakley requested Captain Macintosh to secure the M/Y Serendipity in accordance with the established Hurricane Plan for the vessel. Unfortunately, on August 30, 2019, the M/Y Serendipity suffered severe damage from the Category 5 Hurricane and was later deemed to be a total loss after the dock pilings were destroyed and the vessel was grounded. (Exhibit 15, Photos). After a timely filed insurance claim from Plaintiff, Defendant Underwriters breached the insurance contract by proffering three invalid and illegitimate reason for denial of the claim: 1) breach of the Captain and Crew Warranty, 2) noncompliance with the Hurricane Plan, and 3) false information in the insurance application and renewals. (Exhibit 11, Rejection Letter & Exhibit 10, Deposition of Underwriters Garyfallia Konstanpoulou, 12:7-13, 12:17 & 38:2-39).

As for the first proffered reason, Plaintiff did not breach the alleged Captain and Crew Warranty because it is invalid and unenforceable due to being vague, ambiguous, and contradictory, especially since it is a contract of adhesion and must be construed against its drafter, Defendant Underwriters, and in favor of the insured. As for the second proffered reason, Plaintiff did not breach the Hurricane Plan because Plaintiff was permitted to bring the subject vessel to the Bahamas on a vacation, and which did not make a change in its primary mooring location and otherwise acted in accordance with the plan. And as to the third and final proffered reason, Plaintiff did not make any misrepresentations in light of the ambiguities present in the contract.

5

## II. PLAINTIFF'S STATEMENT UNDISPUTED OF MATERIAL FACTS

Pursuant to Local Rule 56.1, Plaintiff has filed and submitted its Statement of Undisputed Material Facts as a separate document.

## III. SUMMARY JUDGMENT STANDARD

Pursuant to FRCP 56(a), "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Ellis v. England, 432 F.3d 1321, 1325 (11th Cir. 2005) (quoting Comer v. City of Palm Bay, Fla., 265 F.3d 1186, 1192 (11th Cir. 2001)). In disputing a material fact, it is insufficient for the nonmoving party "simply [to] show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the nonmoving party must produce enough evidence to enable a jury to reasonably find for the nonmoving party on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

## IV. LEGAL ARGUMENT - PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT AGAINST DEFENDANT UNDERWRITERS FOR BREACH OF CONTRACT

Plaintiff entered into a valid written contract with Defendant to provide hull insurance in the amount of $565,500.00 for the M/Y Serendipity. The terms of the Policy clearly state that "This insurance shall be governed by and constructed in accordance with the laws of the State of Florida and each party agrees to submit to the exclusive jurisdiction of the courts of the United States of America." (Exhibit 2, Policy, page 14). The elements of a breach-of-contract claim are as : (1) a valid contract; (2) a material breach; and (3) damages. See, e.g., 17A AM. JUR.2D Contracts § 707 (2007); FWF, INC. v. Detroit Diesel Corp., 494 F. Supp. 2d 1342, 1360 (S.D. Fla. 2007). Defendant Underwriters breached its duty to provide insurance coverage when it proffered three invalid reasons for denial. Gallagher v. Dupont, 918 So.2d 342 (Fla. 5th DCA 2005) ; Welford v. Liberty Mut. Ins. Co., No. 16-14054, at *6 (11th Cir. Nov. 29, 2017). Further, under Florida

6

law, "an insurer owes a duty of good faith to its insured." McNulty v. Nationwide Mutual Ins. Co., 221 So. 2d 208, 211 (Fla. Dist. Ct. App. 1969). Further, "the contractual duty of the insured to defend justifies an implication that the insurer will exercise ordinary care and good faith in so proceeding." Id. If an insurer wrongfully denies coverage that actually exists, the insurer has breached the insurance contract. Gallagher, 918 So.2d at 347.

### A. **PLAINTIFF DID NOT BREACH THE CAPTAIN WARRANTY BECAUSE IT WAS INVALID AND UNENFORCEABLE DUE TO ITS INHERENT AMBIGUITIES, CONTRADICTIONS AND VAGUENESS**

As its first proffered reason for denial, Defendant Underwriters claim that Plaintiff breached the Captain & Crew Warranty. However, Defendant Underwriters has failed to recognize the clear ambiguities and vagueness inherent in the Captain & Crew Warranty, which make it unenforceable. In doing so, they are also breaching their duty of good faith to insureds. "An agreement is ambiguous if as a whole or by its terms and conditions it can reasonably be interpreted in more than one way." Haggin v. Allstate Invs., Inc., 264 So. 3d 951 (Fla. 4th DCA 2019). The Warranties provide the following, in verbatim, which is susceptible to numerous interpretations:

> **"Warranted a full-time licensed captain is employed for the maintenance and care of the vessel and is aboard while underway.**
>
> **Michael Sean Oakley is permitted to operate the vessel without the Captain aboard."** (Exhibit 1 Warranties)

The second part of the warranty directly contradicts the first part.[1] And the first part of the warranty raises an almost limitless number of questions. For example, with regards to the first part of the warranty:

---

[1] It should also not be forgotten that the first part of the warranty directly contradicts the language of the Policy itself, which states "It is agreed that the person in charge of and in command of **Your Boat** while making way or under way shall only be **You** or others as may be permitted by the terms and conditions of this **Contract**." (Exhibit 2, Policy at pg. 7) (emphasis in original). See also, Exhibit 2 at pg. 12. "NAMED OPERATORS - If the insured Boat has speed

7

- Does it mean that only a captain may perform "the maintenance and care" of the M/Y Serendipity?
- Why would a captain have to perform the general boat maintenance, which presumably includes scrubbing the deck, washing the sides, performing oil changes, servicing the engines, applying paint and laminates, and a host of other boat maintenance tasks?
- Why wouldn't another person be more qualified for those maintenance and care tasks?
- Is the captain only permitted to perform those boat maintenance and care tasks while the vessel is "underway"?
- If so, why is he not permitted to do those maintenance tasks while the boat is docked?
- Does "care" mean something other than "maintenance"? Does it include operating the boat? If "care" is supposed to mean the same as "operate", then why isn't "operate" used, as in the second part of the warranty?
- What exactly is a "full time licensed captain"? Who must the captain be licensed by?
- What kind of license does he require? Isn't "captain" a term that connotes a title, rather than any specific licensure?
- What is considered "full time"? Does it mean that the captain must be paid during normal working hours, such as 8am to 5pm, Monday to Friday? Or must the captain be aboard the ship 24 hours a day, 7 days a week?
- Since Mr. Oakley is expressly permitted to operate the vessel without the captain aboard, does that mean that Mr. Oakley only needs to have a captain "on call" at all times? Stated another way, does the captain only need to be available by phone? Especially since the Warranty indicates that the captain does not need to be on board at the same time as Mr. Oakley?
- If Captain Connelly is available full-time as a second and/or backup captain, as claimed in his affidavit, why would that not satisfy the warranty?
- Or does this warranty essentially require the captain to live on the boat? Does that even make sense for a 61-foot pleasure vessel? If the captain wants to leave the boat, does a second captain need to be on standby?
- Is the captain employed "full time" if he is only aboard while the vessel is "underway"? Wouldn't that contradict "full time" and imply that the captain is actually part-time?
- What does "employed" mean? Must the captain be on the payroll? What is and is not acceptable compensation?
- How many crew should there be? What must their duties be? Is the crew different or the same as the captain?
- Must there also be engineers, deckhands, cleaning staff, cooks, butlers, and mates? What kind of crew is required?
- If Mr. Oakley is expressly permitted to operate the vessel without the captain aboard, then how can that possibly be squared with the first part of the warranty which always requires a captain to be aboard while the vessel is underway?

---

capability exceeding 45 knots, the Boat **may only be operated by You** and/or another operator declared to and approved in advance by Us in writing." (emphasis added). The document should be construed as a whole and read together according to general contract principles, lending further credence to the reading that Plaintiff has the right to operate the vessel by himself. Talbott v. First Bank Fla., FSB, 59 So. 3d 243 (Fla. 4th DCA 2011)

8

We could go on, but it is not necessary. The point of the foregoing is that the captain and crew warranty is so ambiguous and vague and confusing that it is incapable of being complied with and should never be enforceable against any party. Further, none of the words used in the Captain and Crew Warranty are defined and are capable of multiple interpretations. In cases such as this, it is well established in insurance law that ambiguities are to be construed against the insurer, because insurance contracts are contracts of adhesion. Miller, D.S., 1988 NAIC Journal of Insurance Regulation. For example, in Washington National Ins. Corp. v. Ruderman, 117 So. 3d 943, 950 (Fla. 2013), the Supreme Court majority explained that many Florida opinions have provided the black-letter rule "that where a contract of insurance is ambiguous, it is to be liberally construed in favor of coverage and strictly against the insurer." See also, Ocean's 11 Bar and Grill v. Indemnity Insurance Corporation, RRG, No. 11-6157-CIV-ALTONAGA, (S.D. Fla 2012) and Mercury Ins. Co. v. Markham, 36 So.3d 730, 733 (Fla. Dist. Ct. App. 2010).

In determining ambiguity in a marine insurance contract, this Court has stated that "a policy's language is ambiguous when its meaning is doubtful." Certain Underwriters at Lloyds, London v. Giroire, 27 F. Supp. 2d 1306, 1310, (S.D. Fla. 1998), citing Hagen v. Aetna Casualty & Sur. Co., 675 So.2d 963 (Fla. 5th DCA 1996). Further, "whether the terms of a policy are ambiguous depends not upon the meaning of such terms to one engaged in the insurance business or trained in law, but upon what the drafter of the policy might reasonably anticipate would be the effect of the language used upon an untrained mind." Id. citing John A. Appleman and Jean Appleman, Insurance Law and Practice section 7386; See also, FWF, INC. v. Detroit Diesel Corp., 494 F. Supp. 2d 1342 (S.D. Fla. 2007). Taking all of this into account, this Court should find that the Warranty was ambiguous and unenforceable on Plaintiff, who are not "trained minds" and were understandably confused about the meaning and requirements of the Warranties.

The fact that the warranty directly contradicts itself, as well as the policy, creates an unavoidable ambiguity that must be construed for coverage against the insurer. See Empire Surplus Lines v. Chabad House Of North Dade, 771 F. Supp. 2d 1336, 1344 (S.D. Fla. 2011). Basic rules of contract interpretation require that ambiguities in a contract be construed against the drafter, which in this case was Underwriters. Id. A reasonably competent insurer would never have presented such a confusing clause to the insured that contradicts itself on its face. And though it is disputable whether Underwriters was actually informed by USI of Mr. Oakley's boating qualifications and desire to operate the boat by himself, it is clear from the record that Mr. Oakley had wished to do so as can be further inferred from the clauses in the Warranty and Policy permitting him to operate the boat by himself without any captain on board.

Defendant USI's agent/broker Ms. Green further illustrates the ambiguity that was present in the Policy. Even she could not define what the term crew meant in the Captain and Crew Warranty. She stated that the captain and the crew member are the same person, stating: "Yes. I was only aware of the captain," (Exhibit 3, 48:11-14) and that "I don't believe that there is a crew requirement. I don't recall that." (Exhibit 3, 10:5-6). The Crew Warranty is so ambiguous, because it does not explain or indicate anything about the crew requirements. (Exhibit 3, Green deposition 25:21-23, 39:5-9 and 25:21-23). Such ambiguities jeopardize the insured, because any possible allegations as to what is required can be proffered by the insurer to avoid payment on a claim. Exxon Corp. v. St. Paul Fire & Marine Ins. Co., 129 F.3d 781 (5th Cir. 1997). Therefore, the captain and crew requirement are grossly ambiguous and unenforceable. An ambiguous marine insurance contract drafted by the insurer will always be interpreted in favor of the insured. Id.

All that being said, Plaintiff did employ a full-time captain as that term can be understood under the Warranty. Captain Connelly was available full-time to serve as Plaintiff's backup and/or

10

assistant captain as needed. Captain Connelly chose to be compensated with dinners, trips and other items of value in exchange for his service. (Exhibits 5 & 6, Affidavits of Captain Connelly). Plaintiff has not found any case law which suggests that compensation involving something other than money is inadequate to constitute consideration or compensation. Further, according to Underwriters FRCP 30(b)(6) witness John Hewlett, "Issuance of the policy was not predicated on the crew requirement." (Exhibit 4, 16:18-19). As the corporate witness, such testimony is binding on Defendant Underwriters.

A professional marine insurance company such as Underwriters is supposed to be held to a higher standard of care in drafting insurance contracts than ordinary citizens such as Plaintiff, but it is clear that Underwriters failed this by drafting an ambiguous warranty capable of many possible interpretations. See <u>Tiara Condominium Ass'n., Inc. v. Marsh, USA, Inc.</u>, 991 F.Supp.2d 1271 (S. D. Fla. 2014). The higher standard is warranted because professionals such as Underwriters are assumed to be more knowledgeable and experienced than an ordinary prudent person such as Plaintiff. Members of the professional insurance industry should at least know how to draft a policy that is reasonably capable of interpretation. And since "it is settled law that insurance policies in general… are interpreted strictly against the carrier," <u>Mitchel v. Cigna Prop. & Cas. Ins. Co.</u>, 625 So.2d 862, 864 (Fla. 3d DCA 1993), there is little doubt that the Captain Warranty in question was ambiguous and should not be enforceable against Plaintiff.

**B. PLAINTIFF DID NOT BREACH ANY ASPECT OF THE HURRICANE PLAN BY BRINGING THE VESSEL TO THE BAHAMAS**

Defendant Underwriters' second reason for denial was breach of the Hurricane Plan. First, there should be no dispute that the M/Y Serendipity was within the Navigation Limits of the Policy, which expressly included the Bahamas. (Exhibit 12, Declarations page). The next question is whether the vessel was brought to the Bahamas in accordance with the terms of the Policy.

11

According to the Policy and Warranty's own terms, as explained at length above, Mr. Oakley was allowed to drive the boat by himself, and so that question must be answered in the affirmative.

The Hurricane Plan itself is a simple, 2-page, handwritten document. (Exhibit 13). It only notes the marina where the boat is primarily kept. (Id. at #2). It does not request to be updated every time the subject vessel is moved. It notes that the boat is secured with 6 long lines with protection for chafing. (Id. at #7). In the event of a named storm-warning, it states that a boat captain, Mr. Oakley, or Ms. English will move the boat and put all loose articles away and tie down the Bimini top. (Id. at #16). If alternative plans are needed, then it states that they will tie down the Bimini top and put double lines all around the boat. (Id. at #17). Those are all the relevant provisions.

For some reason, Defendant Underwriters seems to suggest that the Hurricane Plan was breached because it was not at its primary mooring location in Port Canaveral. First, as a matter of law, the Hurricane Plan does not constitute a warranty by the insured. Rather, the Hurricane Plan is a representation pursuant to Florida Statute 627.409, which states in part: "Any statement or description made by or on behalf of an insured or annuitant in an application for an insurance policy or annuity contract, or in negotiations for a policy or contract, is a representation and not a warranty." As a representation, and not a warranty, there is only an obligation that the statements were true and not misleading at the time they were made. But more importantly for our purposes, there is no requirement anywhere in the Sea Wave Policy or Hurricane Plan that demanded the insured to notify the broker or carrier whenever the boat was being temporarily berthed at an approved navigation location. Plaintiff's primary mooring location had not changed and the subject vessel was within the Navigation Limits of the Policy. Temporarily bringing the vessel to the Bahamas could not constitute a change in the primary mooring location. Even Ms. Green testified

12

that she was unaware of any process requiring a new hurricane plan every time a boat went from one marina to another. (Exhibit 3, 18:8-14).

Ms. Garyfallia Konstantopoulou, Defendant Underwriters FRCP 30(b)(6) witness from Travelers, testified that she was the claims leader that actually denied Plaintiff's claim. She stated that a major reason for the denial was her belief that the subject "vessel spent more time in the Bahamas than in Florida" and therefore breached the Hurricane Plan. (Exhibit 10, 13:13-17). However, this is a completely unfounded and baseless allegation and is not supported by any facts. These statements are prejudicial and ultimately false. She further stated that "hurricane plans is not in my area. I'm not the one reviewing hurricane plans." (Exhibit 10, Konstantopoulou 40:15-16).

By her admission, Ms. Konstantopoulou is not qualified to expound regarding hurricane plans, and yet she denied Plaintiff's claim based on the Hurricane Plan. Defendant Underwriters should be estopped from even claiming breach of the Hurricane Plan as a reason for denial based on this testimony. At worst, Ms. Konstantopoulou's observations were made in bad-faith. As noted by Welford v. Liberty Mut. Ins. Co., No. 16-14054, at *6 (11th Cir. Nov. 29, 2017), "Under Florida law, 'an insurer owes a duty of good faith to its insured.'" At best, her observations were unfounded, prejudicial and negligent observations that are in direct violation of Florida Administrative Rule 69B-220.201 and Florida Administrative Rule 4-36.08, which require that an insurer put the duty of fair and honest treatment of the insured above their own interests, that they treat all claims strictly in accordance with the insurance contract, that they not undertake the settlement of any claims with which they are not competent or knowledgeable or which exceeds their expertise, and that they handle every claim with honesty and integrity and allow a fair and impartial adjustment or settlement, and more.

13

Plaintiff does not believe that Defendant Underwriters can seriously contend noncompliance with any other aspect of the Hurricane Plan. With respect to the other aspects of the Hurricane Plan, the boat was secured with lines as required by Items #16 and 17. Unfortunately, the storm was so severe that it would not have mattered how many lines were used to secure the M/Y Serendipity, because the pilings of the dock itself snapped in half. (Exhibit 15 damage pictures) The vessel was under the care of Captain Macintosh during the Hurricane and had been secured by Mr. Oakley prior to returning to Florida. Neither the Hurricane Plan nor the Policy required that the M/Y Serendipity race back to Florida in the event of a hurricane. Besides, any suggestion that the M/Y Serendipity should have been moved to Florida between the formation of the Hurricane on August 27 and when it hit the Bahamas on August 30 is distorted by hindsight bias. As shown on the weather reports, when the storm began forming on or about August 27, 2019, Hurricane Dorian was predicted to hit Cape Canaveral, Florida. (Exhibit 9, Weather Reports & Exhibit 14, Underwriters' Admissions). Of course, the true path was never certain and it could have gone in a number of different directions at any time. Based on the information available at the time, Mr. Oakley determined that the vessel would be safer in the Bahamas. It would have been an unnecessary hazard to attempt to move the vessel hours before the Hurricane struck and risk facing the storm in the open sea. There were not any predictions that Hurricane Dorian would hit Abacos until hours before it hit Paradise Cay. Id. Once it appeared that the storm could strike the Bahamas, Mr. Oakley took appropriate precautions to protect the vessel, which consisted of non-stop video surveillance, additional lines, and instructions to Captain Macintosh. In reality, Mr. Oakley took even more action than was necessary under the Plan to protect the M/Y Serendipity.

In sum, it is undisputed that the policy allowed the subject vessel to travel to the Bahamas and there were no requirements that the vessel return to Florida in the event of a storm. The

Hurricane Plan was meant to be adaptable to wherever the vessel was if a storm occurred and Mr. Oakley acted accordingly during Hurricane Dorian. During her deposition, Ms. Konstantopoulou claimed that the only reason for the supposed breach of the Hurricane Plan was her belief that the vessel spent more time in the Bahamas than Florida, but this should not be given any weight given that it is completely unfounded. (Exhibit 10, 42:1-3).

### C. PLAINTIFF DID NOT MAKE ANY MATERIAL MISREPRESENTATIONS IN ITS JUNE 19, 2019 APPLICATION

As to the third and final proffered reason for the denial of insurance, Plaintiff did not make any material misrepresentations in its June 19, 2019 insurance renewal application or the 2015 insurance application which would serve as a basis to deny recovery, especially in light of the ambiguities present in the contract. First, an insurer seeking to avoid coverage under Florida Statute 627.409 bears the burden of pleading and proving the misrepresentation, its materiality, and the insurer's detrimental reliance. Griffin v. Amer. Gen. Life & Acc. Ins. Co., 752 So.2d 621 (Fla. App. 1999). Ms. Konstantopoulou alleged 1) that the 2019 application contained false information that would preclude recovery because there had not been any changes to the crew whereas the initial application disclosed that there was a licensed captain and 2) that the primary mooring location of the vessel was Florida listed as Florida but the Vessel was actually moored in the Bahamas. (Exhibit 10, 12:7-13:17 & 38:2-39:4).

As for her first point, which is not very clear, it appears to go towards the ambiguous captain requirement discussed at length above and the fact that Plaintiff did employ Captain Connelly on a full-time basis. Captain Connelly was retired from his regular career and thus available full-time to provide his captain services on the M/Y Serendipity. He was "always available." (Exhibit 7, Connelly Affidavit at para. 4.) Although Captain Connelly was a friend of

15

Mr. Oakley and Ms. English, the parties had a professional relationship and Captain Connelly chose to be paid with dinners, trips, and other items of value instead of cash. (Id. at para. 5). Plaintiffs would use the professional services of Captain Connelly to obtain information and help concerning cruising itineraries, boat repairs and upgrades, and many other boating-related issues. Id. Captain Connelly's statements are uncontroverted and show that Plaintiffs made a truthful representation to Defendant Underwriters when they stated that they paid a full-time captain throughout the period of the Policy. The fact that Captain Connelly was always "on call" for advice and help can even be analogized to how other professionals on retainer operate, such as accountants, marketers, or even attorneys. And the fact that Captain Connelly, as is his prerogative, elected to be paid with services and items of value instead of money is of no consequence. Because Captain Connelly maintained his position as a captain of Plaintiff throughout the Policy, there has never been a "change" in the "crew." (Exhibit 5, Application, at page 2). No other operators, crewmen or captains have been added to the M/Y Serendipity since the inception of the policy.

Ms. Konstantopoulou's second alleged misrepresentation merits even less discussion and has been previously addressed as well. She claims that the M/Y Serendipity's primary mooring location and hurricane protection plan is no longer truthful because the vessel's primary mooring location is now in the Bahamas and that the vessel should only be moored in Florida in the event of a hurricane. (Exhibit 10, 13:13-17) This is simply not true. Perhaps the greatest benefit of having a boat is the ability to take it on trips to new places. So long as Plaintiff stayed within the navigation limits of the Policy, Plaintiff was well within its rights to cruise to the Bahamas for a temporary vacation. There was never any intent to change the primary mooring location of the boat to the Bahamas and such suggestions by Ms. Konstantopoulou are baseless. And as discussed above, the Hurricane Plan and/or Policy did not require Plaintiff to race the vessel back to Florida

in the event of a Hurricane, especially when it had initially appeared that Florida would be hit more severely by the storm and could have exposed the vessel and human life to greater risk.

### D. NONE OF THE ALLEGED BREACHES BY PLAINTIFF SERVED TO INCREASE THE INSURANCE HAZARD OF DEFENDANT UNDERWRITERS

In accordance with Florida Statute 627.409(2), "a breach or violation by the insured of any warranty, condition, or provision only excuses the insurer from paying—essentially, it only constitutes a material breach—if such breach or violation increased the hazard by any means within the control of the insured." Fireman's Fund Ins. Co. v. Cox, 742 F. Supp. 609, 611 (M.D.Fla.1989), *aff'd,* 892 F.2d 87 (11th Cir.1989). None of the actions taken by Plaintiff have served to increase the insurance risk of Plaintiff, because the actions have been expressly permitted by the policy.

By the plain terms of the Policy, it cannot be disputed that Mr. Oakley is expressly permitted to operate the boat by himself, without any captain on board. Further, Mr. Oakley is permitted to cruise to the Bahamas, since it is within the navigation limits of the Policy. And finally, Mr. Oakley is not required under the Policy or Hurricane Plan to change the vessel's primary mooring location and update the Hurricane Plan every time he takes the M/Y Serendipity on a temporary trip. Taking all of the above into account, it cannot be said that Mr. Oakley did anything which would have increased the risk or hazards for the insurer. Plaintiff only took actions which were already expressly within the risks assumed by the insurer. Moreover, with respect to the damage sustained by Hurricane Dorian on August 29, 2019, Defendant claims that the vessel should have been under the "care and maintenance" of a "full-time captain", but apparently only while the vessel is underway. The vessel was not

17

underway when it was damaged by the Hurricane. It is just unclear how Defendants' risk has increased more through any action of Plaintiff.

## V. CONCLUSION

In conclusion, Defendant Underwriter has breached the insurance contract with Plaintiff by refusing coverage where it validly exists. It has attempted to avoid coverage by offering three illegitimate reasons for its denial, none of which pass muster. First, Defendant Underwriters has attempted to hide behind an ambiguous and contradictory clause of its own drafting, and which can only be interpreted in favor of the insured under general principles of contract. Even a cursory reading of the two parts of the Captain and Crew Warranty reveals their inherent incompatibility with each other. The Warranties make even less sense upon further deconstruction and examination. Second, Defendant Underwriters made a wholly unsupported determination that Plaintiff had moved the vessel permanently to the Bahamas without updating the insurer, and then tried to inject additional conditions into the Hurricane Plan and Policy where none exist, such as requirements to update Hurricane Plans and Policies for only temporary travel and a mandate to cross the open sea during a literal hurricane to return to Florida. And finally, Defendant attempted to paint Plaintiff's good faith efforts at compliance with the contract as misrepresentations, despite the fact that Plaintiff had done everything in accordance with the terms.

As a proximate result of the Defendant's wrongful denials based on these unfounded, unsubstantiated, and intentional misinterpretations of the Policy terms, Defendant is responsible for Plaintiff's damages in the amount of $565,500.00, plus consequential damages, costs, attorney fees, interest, and such other and further relief in such additional amounts as this Honorable Court deems necessary, just and proper. The above stated material facts are undisputed, and the legal arguments presented conclusively support Plaintiff's Cross-Motion for Summary Judgment.

RESPECTFULLY SUBMITTED

By: /s/ Ronald J. Anania
    Ronald J. Anania
    FBN 5746
    Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that on December 21, 2020, we electronically filed the foregoing Document with the Clerk of Court using the Federal CM/ECF E-Filing Portal. We also certify that the foregoing Document is being served electronically to all counsel of record via the CM/ECF e-filing portal.

ANANIA LAW FIRM, P.A.
10910 SW 10th Court
Davie, FL 33324
Tele: (954) 448-1872
Email: ananialawfirm@gmail.com

By: s/ Ronald J. Anania

Ronald J. Anania