## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-CV-60520-RAR

**SERENDIPITY AT SEA, LLC**,

     Plaintiff,

v.

**UNDERWRITERS AT LLOYD'S OF
LONDON SUBSCRIBING TO POLICY
NUMBER 187581**,

     Defendant.

_____/

### <u>ORDER ON BENCH TRIAL</u>

Almost four years ago to the date of this Order, Hurricane Dorian descended upon Treasure Cay. A Category Five Hurricane, Dorian left much destroyed in its wake. Among the many things lost to the storm was the M/Y Serendipity (the "Serendipity"), a sixty-one-foot Viking Princess yacht owned by Plaintiff Serendipity at Sea, LLC ("Serendipity LLC"). This cause is now before the Court following a bench trial that focused primarily on a single issue: whether Serendipity LLC's breach of a Captain Warranty increased the hazard of the vessel being destroyed by Hurricane Dorian. Having heard evidence from both parties at the bench trial, the Court finds that Plaintiff's failure to employ a full-time Captain on the Serendipity did in fact increase the hazard. Accordingly, Defendant is entitled to judgment in its favor.

### <u>BACKGROUND</u>

#### I. Factual Background

Serendipity LLC is a Florida limited liability company formed for the purposes of owning and managing the Serendipity. Joint Pretrial Stip. ("Stipulation"), [ECF No. 203] ¶¶ 5(a)–(d). The company is owned and managed by husband Mikael Sean Oakley and wife Jacqueline English

("Oakleys").  *Id.*  To insure the Serendipity, the Oakleys purchased a SeaWave Yacht Insurance Policy ("Policy"), which contained a Captain Warranty.  Stip. ¶ 5(j).  The Captain Warranty stated that it was "[w]arranted a full time licensed captain is employed for the maintenance and care of the vessel and is aboard while underway."  *Id.*  Notwithstanding the wording of the Captain Warranty, both parties agree Mr. Oakley could operate the Serendipity with no captain on board. Stip. ¶ 5(k).  The Policy allowed Mr. Oakley to bring the Serendipity to the Bahamas.  Stip. ¶ 5(h). Both parties also stipulate, at this point in the litigation, that Serendipity LLC breached the Captain Warranty because it did not employ a full-time licensed captain to maintain and care for the Serendipity.  Stip. ¶ 5(o).

Exercising his right to operate the Serendipity without a captain on board, Mr. Oakley and two friends traveled from Cape Canaveral, Florida to Treasure Cay on July 27, 2019.  Stip. ¶ 5(s). Mr. Oakley ultimately docked the Serendipity behind a residence on Treasure Cay known as the "Pink Paradise" and departed the Bahamas on August 1, 2019.  Stip. ¶ 5(w).  The plan was to leave the Serendipity docked there until approximately mid-October of the same year.  Stip. ¶ 5(v).  But when Hurricane Dorian hit the island on September 1, 2019, it resulted in the total constructive loss of the Serendipity.  Stip. ¶ 5(z).

## II.  Procedural History

Serendipity LLC eventually filed an insurance claim to recover the loss.  *See* Pl.'s Fourth Am. Compl., [ECF No. 65] ¶ 17.  That claim was denied, and Serendipity LLC filed this action in state court on February 14, 2020 against Defendant for breach of contract.  *See generally* Notice of Removal, [ECF No. 1].  Defendant then removed this action on March 10, 2020.[1]  *Id.*  The operative Fourth Amended Complaint was filed on November 27, 2020.  *See* [ECF No. 65].

---

[1]  After Defendant removed this action, Plaintiff filed an Amended Complaint, [ECF No. 19], and added the broker of the Policy, USI Insurance Services, LLC ("USI"), as a defendant.  Serendipity LLC eventually

### a. *Motions for Summary Judgment*

Serendipity LLC and Defendant filed cross motions for summary judgment, which the Court referred to Magistrate Judge Jared Strauss. *See* Order Referring Mots., [ECF No. 98]. Magistrate Judge Strauss concluded, as Serendipity LLC now stipulates, that Serendipity LLC breached the Captain Warranty. *See* Rep., [ECF No. 103], at 10. But Magistrate Judge Strauss recommended Defendant's motion for summary judgment be denied because it failed to address Florida's anti-technical statute. Pursuant to the anti-technical statute, the mere breach of a warranty within a marine insurance policy does not itself void an insurance contract. *See* Fla. Stat. § 627.409(2). Instead, the insurer must demonstrate the breach "increased the hazard by any means within the control of the insured." *Id.* This Court agreed with Magistrate Judge Strauss, denied the motion for summary judgment, and, pursuant to its authority under Federal Rule of Civil Procedure 56(f), ordered Plaintiff to file a brief addressing whether its breach increased the hazard. *See* Order Affirming and Adopting Report and Recommendation and Denying Petition, [ECF No. 112]. After Plaintiff filed its brief addressing that issue, the Court granted summary judgment in favor of Defendant. Order Granting Summ. J. to Def., [ECF No. 121], at 5–6.

### b. *Appeal*

Serendipity LLC appealed the Order Granting Summary Judgment to Defendant. *See Serendipity at Sea, LLC v. Underwriters at Lloyd's of London Subscribing to Pol'y No. 187581*, 56 F.4th 1280 (11th Cir. 2023). The Eleventh Circuit agreed that Serendipity LLC breached the Captain Warranty. *See id.* at 1286–87. But the Eleventh Circuit disagreed that summary judgment was warranted, holding "a material dispute of fact remain[ed] about whether Serendipity, LLC's failure to hire a full-time licensed captain increased the risk to the Serendipity posed by Hurricane

---

stipulated to dismiss the claim against USI without prejudice. Joint Stip. of Dismissal Without Prejudice, [ECF No. 105].

Dorian." *Id.* at 1289.  In support of its motion for summary judgment, Defendant offered the expert opinion of Captain Thomas Danti.  *See id.* at 1287.  As detailed more thoroughly below, Captain Danti concluded that, in his expert opinion, not hiring a licensed captain increased the risk of the damage done to the Serendipity.  *See* Order Granting Summ. J. to Def. at 4–5.  To rebut this testimony, Serendipity offered "news articles and weather reports covering Hurricane Dorian's path." *Serendipity at Sea, LLC*, 56 F.4th at 1290.  The Eleventh Circuit held that whether Captain Danti's testimony should be credited over these weather reports was "a credibility determination for the jury to make." *Id.*[2]

### III. Trial

Following remand, this case proceeded to a three-day bench trial.  *See* Trial Tr. vol. 1 ("Tr. I"), [ECF No. 248]; Trial Tr. vol. 2 ("Tr. II"), [ECF No. 249]; Trial Tr. vol. 3 ("Tr. III"), [ECF No. 250].  At the bench trial, Plaintiff offered the testimony of four lay witnesses: (1) Captain Trevor Lightbourne; (2) James Passilla; (3) Captain William Scott Connelly; and (4) Mr. Oakley.[3] Defendant offered two expert witnesses: (1) Austin L. Dooley, Ph.D.; and (2) Captain Thomas Danti.  The Court will summarize each witnesses' testimony about the dispositive issue in this case—namely, the decision to dock the Serendipity behind the Pink Paradise during Hurricane Dorian and not evacuate it from Treasure Cay.

---

[2] Notwithstanding the reference to a "jury" in the Eleventh Circuit's decision, this case was set for a bench trial.  *See generally* Dkt.

[3] Shortly before trial, Plaintiff, for the first time, disclosed that it would seek to have Captain Lightbourne, Captain Connelly, and Mr. Oakley testify as "hybrid expert witnesses."  *See* Underwriter's Mot. to Strike Pl. Serendipity at Sea, LLC's Untimely Rule 26 Disclosures of Witnesses, Expert Witnesses, Docs. and Damages, [ECF No. 208].  The Court held these witnesses had to testify as lay witnesses but could "offer testimony regarding their lay opinions, including testimony that draws on their relevant expertise, as permitted by Federal Rule of Evidence 701."  Paperless Omnibus Order, [ECF No. 218].

### a. *Plaintiff's Witnesses*

#### i. *Captain Trevor Lightbourne*

Captain Lightbourne is a licensed captain Mr. Oakley engaged to take care of the Serendipity while it was moored behind the Pink Paradise.  Captain Lightbourne testified about his experience as a boat captain and indicated that he has many years of experience related to preparing vessels for hurricanes.  Tr. I, 23:10–23, 25:12–26:2.  Testifying as to his involvement with the Serendipity during the summer of 2019, Captain Lightbourne agreed he was not acting as the Serendipity's captain while it was moored in Treasure Cay.  Tr. I, 70:25–71:9.  Instead, Oakley arranged for Captain Lightbourne to occasionally check on the Serendipity while it was moored behind the Pink Paradise.  These check-ins would occur about "once every other week," and during these visits, Captain Lightbourne would simply do a visual check of the boat to "make sure everything [was] secure."  Tr. I, 68:15–69:4.

Discussing Hurricane Dorian, Captain Lightbourne testified it was initially his understanding the storm "was always projected to hit Florida" rather than Treasure Cay.  Tr. I, 28:1–6.  Captain Lightbourne admitted he and Mr. Oakley did not have a plan dictating what to do in the event a hurricane struck Treasure Cay.  Tr. I, 70:6–15.  As Captain Lightbourne explained, because hurricanes are "unpredictable," he and Mr. Oakley never made a "game plan or anything until the time when [they] heard about Dorian falling down south."  Tr. I, 70:16–24.  Because Captain Lightbourne and Mr. Oakley only expected Dorian to be a subtropical storm, they decided to tie the Serendipity to the dock behind the Pink Paradise and monitor the weather as it progressed.  Tr. I, 27:16–25.  Captain Lightbourne believed that, due to several geographic features of the island, Treasure Cay was a safe place to moor boats during hurricanes and the canal behind the Pink Paradise was one of the safest spots in the islands.  Tr. I, 33:2–25.

During the week leading up to Hurricane Dorian hitting Treasure Cay, Lightbourne continually discussed the storm with Mr. Oakley.  Tr. I, 26:6–8.  After Dorian progressed to a hurricane, Captain Lightbourne did not take any additional steps to prepare the Serendipity because he felt his existing preparations were sufficient.  Tr. I, 78:9–20.  Captain Lightbourne did not confer with Captain Scott Connelly and did not discuss how to prepare the Serendipity for Hurricane Dorian with anyone other than Mr. Oakley.  Tr. I, 71:24–72:14.  Ultimately, the lines Captain Lightbourne tied to the Serendipity held, but the pilings on the dock broke during the storm.  Tr. I, 43:5–16.

While Captain Lightbourne did not recall when he and Mr. Oakley learned Dorian would make landfall as a Category 5 Hurricane, he stated they learned it "last minute."  Tr. I, 73:3–13.  When asked, he testified that he did not remember other boats leaving Treasure Cay in preparation for Dorian.  Tr. I, 74:24–76:1.  Captain Lightbourne also testified that, even after the storm progressed to a hurricane, he did not think the Serendipity should be evacuated because he did not believe the boat should leave a known safe haven.  Tr. I, 74:7–16, 76:2–20.  He admitted, however, that he did not investigate the possibility of crossing the ocean because Hurricane Dorian was initially only projected to be a tropical storm.  Tr. I, 76:25–77:8.

### ii. James Passilla

Serendipity LLC next called James Passilla, a friend of the Oakleys who owns his own recreational airplane and holds a pilot's license.  Passilla testified that he has flown to Treasure Cay on many occasions and was available to fly Mr. Oakley to Treasure Cay if Mr. Oakley believed the Serendipity should be evacuated from the Abacos.  Tr. I, 84:13–24, 86:8–19, 87:22–89:8. By his estimate, Passilla could arrive in Treasure Cay in about three hours.  Tr. I, 88:19–22.  In brief, Passilla's testimony represented that he and Mr. Oakley planned to fly at a moment's

notice from Florida to Treasure Cay in the face of a potential hurricane for the purpose of evacuating the Serendipity.  Tr. I, 92:8–16.  But in the end, they decided not to fly to Treasure Cay to save the Serendipity.  *Id.*

### iii.  Captain Scott Connelly

Serendipity LLC then called Captain Scott Connelly, a retired captain who advised the Oakleys about purchasing the Serendipity and counseled Mr. Oakley on how to maintain the vessel.  Tr. I, 105:4–20, 108:7–9.  Captain Connelly recalled the Oakleys listed him on their insurance policy as someone who could move the Serendipity in the event of a storm, but he indicated he neither helped the Oakleys obtain insurance for the Serendipity nor knew he was indicated on the Policy as the Serendipity's captain.  Tr. I, 107:8–11, 135:8–136:18.  He also denied being the Serendipity's captain.  Tr. I, 137:2–11.  Captain Connelly stated he did not help Mr. Oakley plan the trip to the Abacos and claimed he had "complete confidence in Mr. Oakley's ability to think for himself."  Tr. I,  137:19–20, 138:20–25, 139:1–10.

As with Captain Lightbourne, Captain Connelly testified about his experience with hurricanes.  Tr. I, 109:7–110:10.  Captain Connelly explained that preparing for a hurricane requires a captain to have an evacuation plan, but he noted the exact evacuation plan can remain uncertain given that a captain does not know the direction and path of the storm until shortly before it arrives at a particular location.  Tr. I, 139:23–141:10.  He testified that during the week preceding Hurricane Dorian's arrival at Treasure Cay, he kept track of the storm and discussed it with Mr. Oakley.  Tr. I, 110:11–111:11.  Similar to Captain Lightbourne, Captain Connelly's initial assessment of Dorian was that it did not "look like it was going to be much" of a storm.  Tr. I, 111:5–11.

Serendipity LLC's counsel presented various weather reports from the week preceding Hurrian Dorian to Captain Connelly to elicit his testimony about the period just before the storm hit.  Based on these weather reports and his own recollection, Captain Connelly—testifying as a lay witness—stated that as of August 27, 2019, Dorian was only a tropical storm whose projected path subsumed all of Florida.  Tr. I, 112:6–17, 113:9–18.  And the "bullseye" of the storm was projected to be Cape Canaveral.  Tr. I, 114:16–18, 132:8–21.  Captain Connelly testified that, by August 27th, Dorian was projected to pass by the Abacos as a "marginal" storm and believed Treasure Cay was a secure place to keep the Serendipity.  Tr. I, 143:11–15.

When Captain Connelly was shown a weather report for the next day, August 28, 2019, he testified that Dorian, by then a hurricane, was not large and was still projected to potentially cover most of Florida and mostly miss the Abacos.  Tr. I, 115:13–14, 116:10–12, 117:1–7.  He recalled advising Mr. Oakley to keep the boat in the Abacos because the boat was "tied up well," the storm was heading toward Florida, and the Abacos was a more secure place "than you can find on short notice in Florida."  Tr. I, 117:23–118:2.  He reiterated this opinion on cross examination, noting he would not have been inclined to evacuate Treasure Cay because the storm was projected to strike Cape Canaveral.  Tr. I, 144:15–23.  Moving to the following day, Captain Connelly testified the next weather report showed little change between August 28th and August 29th.  Tr. I, 118:18–119:9.  Based on this report, Captain Connelly agreed he would be "happy" to be in the Abacos rather than Florida, because he would be unsure of where to take the boat.  Tr. I, 119:10–14.  Accordingly, he and Mr. Oakley discussed leaving the Serendipity where it was in Treasure Cay, and Captain Connelly testified that "[g]iven the choices" he believed it was better to stay in Treasure Cay.  Tr. I, 119:20–120:1, 120:15–22.

Counsel proceeded to show Captain Connelly a weather report from August 30, 2019. Captain Connelly indicated the storm was "not good" but not "catastrophic." Tr. I, 121:19–122:3. He opined that by this point it was too late to move the Serendipity to Florida. Tr. I, 122:4–8. To support this conclusion, Captain Connelly stated he would not "know where in Florida to take" the Serendipity had he left with it and, on cross examination, emphasized he was unsure why someone would evacuate the Abacos to Cape Canaveral. Tr. I, 122:19–21, 145:6–16. On this point, Captain Connelly later noted that Cape Marina, a port located at Cape Canaveral that served as the Serendipity's home port, has a rule by which any vessels under 500 tons cannot dock there during a hurricane. Tr. I, 145:11–16. This increased the uncertainty surrounding whether the Serendipity could dock there if the boat was evacuated from Treasure Cay. Tr. I, 145:11–16. Captain Connelly also recounted certain physical features about Cape Marina that he believed made it a worse place to dock during a hurricane than Treasure Cay. Tr. I, 146:9–13. Captain Connelly did not, however, know whether the Serendipity had a slip at Cape Marina because it was not his "duty to know that" and he was not involved in selecting mooring locations for the Serendipity. Tr. I, 146:25–147:12.

Captain Connelly testified that Hurricane Dorian increased in intensity on August 31, 2019 and became a "major storm." Tr. I, 123:6–17. Nevertheless, he maintained his recommendation to stay in the Abacos and testified that, even if he had been with the Serendipity, he would not have attempted to leave Treasure Cay. Tr. I, 124:6–8, 125:3–8. Captain Connelly later stated, however, that he remained available to fly down to the Abacos in the event he believed the Serendipity should be evacuated from Treasure Cay. Tr. I, 149:2–6. Captain Connelly largely agreed with Captain Lightbourne's testimony about the safety of Treasure Cay, claiming he did not know a safer place to secure a vessel in the Abacos than Treasure Cay and that the canal behind the Pink Paradise would be his preferred spot to moor a vessel on the island. Tr. I, 125:18–126:1,

130:12–15, 131:3–5.  He also corroborated Captain Lightbourne's testimony that the lines tied to the Serendipity held but the dock it was tied to broke.  Tr. I, 127:17–128:9.

When asked about the subject on cross examination, Connelly acknowledged the Serendipity could have made the trip back to Cape Marina from the Abacos anytime from August 26th until August 30th.  Tr. I, 148:5–22.  Cross examination also illuminated several facts that formed the basis of Captain Connelly's determination that the Serendipity should not be evacuated from Treasure Cay.  Most notably, Captain Connelly stated that, as far as he was aware, the Serendipity was not on a "haul-out" list.  Tr. I, 150:11–22.  When presented with his prior statement that "any attempt to bring the vessel from the Bahamas to Florida between August 29th and 30th would have been absolutely foolhardy," he explained this opinion was based partly on the fact that there was no "safe harbor to go to" because Serendipity LLC did not have a haul-out reservation.  Tr. I, 157:15–158:19.  But Captain Connelly acknowledged that having a haul-out reservation at a marina is prudent when a captain knows the vessel will be near the marina and a reservation is available.  Tr. I, 159:2–13.  Captain Connelly believed that, had the Serendipity been on a haul-out list, it could have been brought back to Cape Marina and hauled out before the storm hit.  Tr. I, 150:20–151:5, 155:2–7, 159:14–19.  Finally, Captain Connelly acknowledged this would have been "preferential to what happened" and claimed it "is a fact" that "[i]f [Serendipity] were on the hill at Cape Marina . . . it would not have been destroyed."  Tr. I, 159:22–23, 160:5–7.

### iv.  Mikael Sean Oakley

Mr. Oakley testified about his decision to bring the Serendipity to Treasure Cay and leave it behind the Pink Paradise during Hurricane Dorian.  Mr. Oakley recounted some preparations he made for the trip to Treasure Cay, including purchasing new equipment for the Serendipity.  Tr. II, 83:18–85:9.  When asked if he had prepared an evacuation plan in the event a hurricane

approached the Abacos, Mr. Oakley indicated he would simply wait to see where the hurricane was going and move the boat in response.  Tr. II, 86:19–87:14.  He also confirmed he did not arrange for the Serendipity to be hauled out in the event of a hurricane.  Tr. II, 90:17–24. Emphasizing this lack of planning, Mr. Oakley even implied on cross examination that it would be incorrect to make a hurricane evacuation plan for every port a boat is docked in.  Tr. II, 110:22– 111:2, 114:10–15.

Mr. Oakley confirmed Captains Lightbourne and Connelly's testimony about their involvement with the Serendipity.  He claimed Captain Lightbourne would "jump on board and just make sure nothing was going wrong with it."  Tr. II, 15:21–16:9.  Mr. Oakley also testified as to Captain Lightbourne's work to prepare the Serendipity for Hurricane Dorian, and he confirmed Captain Lightbourne was also working for multiple other people with boats in Treasure Cay and could not leave with the Serendipity in the event it needed to be evacuated.  Tr. II, 94:4–25, 103:8– 14, 117:20–24.  As to Captain Connelly, Mr. Oakley testified that he did not help form an evacuation plan for the trip to Treasure Cay, but had Captain Connelly advised him to move the boat from Treasure Cay he would have done so "[i]n a heartbeat."  Tr. II, 18:15–22, 103:15–20. He also emphasized that Passilla was available to bring him and Captain Connelly to the Abacos in the event Captain Connelly provided that advice.  *Id.*

Mr. Oakley also reiterated much of Captain Lightbourne and Connelly's testimony about the decision to keep the Serendipity in the Abacos.  Mr. Oakley emphasized that he reviewed news sources and weather reports in the lead up to the storm and was in contact with Captains Lightbourne and Connelly. *See, e.g.*, Tr. II, 16:20–23, 17:22–18:17, 21:20–22:8, 24:17–24, 30:23– 32:15, 37:2–12, 95:23–96:15.  And while the Court will not reiterate in detail the now-familiar progression of the storm, Mr. Oakley's testimony about its progression was consistent with that of

Captains Lightbourne and Connelly: Dorian started out as a smaller storm that was projected to mostly hit Florida and eventually gained strength and veered toward Treasure Cay. *See, e.g.*, Tr. II, 22:9–16, 23:2–25:21, 26:12–27:18, 34:19–35:13, 97:24–98:17.  Mr. Oakley testified that, given the potential danger posed by a move, he considered August 29, 2019, as the last day to make a decision about evacuating the Serendipity.  Tr. II, 25:22–26:7, 32:16–33:5, 91:7–92:6.  Mr. Oakley verified that prior to August 29th, he confirmed conditions were appropriate to make a crossing back to Florida.  Tr. II, 131:9–19.  He explained that his decision not to move the Serendipity was due to an amalgamation of factors, including the unpredictability of the storm, the fact it was projected to hit Cape Canaveral, and the weather reports he reviewed at the time. *See* Tr. II, 93:6–21.  He also included the fact that he did not have a planned spot for the boat to return to in Florida.  Tr. II, 104:25–105:7.

Mr. Oakley was asked whether the failure to hire a captain increased the hazard posed by the storm.  Rather than answer this question directly, he expressed his view that Treasure Cay is a desirable place to keep a boat in the middle of a storm and emphasized the danger posed by the storm as it grew in size. *See, e.g.*, Tr. II, 33:10–22.  He also noted he contacted Cape Canaveral at one point to ask about bringing the Serendipity there and was told not to bring the boat there if the Serendipity was not already on the east coast of the United States.  Tr. II, 32:23–34:5, 92:19–25.  And because of the uncertainty about whether he could have the Serendipity hauled out of the water, he considered Pink Paradise a safer location to moor it.  Tr. II, 34:6–16, 37:22–40:12.

Later in his testimony, Mr. Oakley agreed that he would have been able to have the boat hauled out at Cape Marina if he had made a reservation and evacuated the boat from Treasure Cay in a timely manner.  Tr. II, 100:14–21.  He also agreed that if the Serendipity had been moored at

Cape Marina when Hurricane Dorian hit, his plan would have been to haul the boat out of the water if the port was evacuated.  Tr. II, 113:4–19.

### b. Defendant's Witnesses

### i. Austin Dooley

Austin Dooley, Ph.D. of Dooley Sea Weather Analysis, Inc. is a highly skilled professional meteorologist and oceanographer that has taught at both the United States Merchant Marine Academy and the Maritime College. Tr. II, 158:18–159:21.   Dr. Dooley is also a former professional mariner who has held a variety of Coast Guard licenses. Tr. II, 160:22–161:21.   He was qualified as a meteorological expert.  Tr. II, 163:11–19; Tr. III, 17:3–8.

Dr. Dooley determined that both the National Hurricane Center ("NHC") and the government of the Bahamas predicted Hurricane Dorian would hit the Abacos ahead of the storm. Tr. II, 177:23–178:19.  Based on Dr. Dooley's review of weather reports and other data available prior to Dorian's landfall, he stated that the NHC determined as early as August 26, 2023 that Dorian would hit the Abacos to some extent and advised the public to complete any tropical storm preparations by Friday, August 30, 2019.  Tr. II, 171:5–172:1.  NHC later extended this deadline to August 31, 2019.  Tr. II, 173:5–10.  Dr. Dooley also determined that by August 28, 2019, Dorian was predicted to arrive in the area of the Abacos islands as at least a Category 3 hurricane.  Tr. II, 175:12–17.  According to Dr. Dooley, the charts that formed the bases for his opinions are publicly available and should be used by people when determining what preparations to make for storms. Tr. II, 173:11–17.

Dr. Dooley's investigation into the historical facts about Hurricane Dorian also indicated that thirty-six warnings about the storm were issued for the Abacos, likely via the local media.  Tr. III, 7:3–25.  Additionally, the government of the Bahamas initiated an evacuation effort for some

of the islands roughly sixty (60) hours before Hurricane Dorian reached the Bahamas.  Tr. III, 8:15–9:21.  On cross examination, Dr. Dooley admitted he did not know where these parts of the Bahamas were being evacuated to.  While the report used the term "mainland," he was not sure whether this meant the United States or instead referred to a part of the Bahamas considered to be the mainland of the islands.  *See, e.g.*, 41:1–44:25.

Dr. Dooley also testified about his analysis of automatic identification system (AIS) data. AIS is a system through which vessels with the appropriate equipment send a signal that indicates the vessel's GPS position.  Tr. III, 10:5–13.  Dr. Dooley frequently uses AIS data.  Tr. III, 12:16–14:13.  Analyzing AIS data relating to recreational boats smaller than 120 feet, Dr. Dooley concluded that a number of vessels left the Bahamas for the United States between August 25, 2019 and August 31, 2019.  Tr. III, 26:1–4, 30:24–31:13, 34:6–16, 37:1–5, 83:4–84:4.  Dr. Dooley noted a similar trend in the Cape Canaveral area: vessels moved from Cape Canaveral to a seemingly safer area of Florida in anticipation of the storm.  Tr. III, 38:7–39:1, 48:1–6.  But Dr. Dooley conceded some limitations of his AIS data.  First, if a vessel is not turned on, it does not emit the frequency that is received as AIS data, and therefore a boat that is turned off is not captured in the dataset.  Tr. III, 47:2–6.  Second, Dr. Dooley indicated that there was no minimum size for the vessels captured within his data.  Tr. III, 49:5–50:3, 52:20–53:1.  And third, Dr. Dooley acknowledged AIS data does not indicate the type of boat sending a signal.  *See id.*

Dr. Dooley also raised concerns about using five-day hurricane forecasts.  He noted that on these forecasts, days four and five are very uncertain, with the radius of error being nearly 200 nautical miles.  Tr. III, 56:1–57:7.  Accordingly, Dr. Dooley believed that when a person plans to move in response to a storm, they should use a three-day chart because it is more accurate.  Tr. III, 57:8–58:2.  Dr. Dooley also pushed back on the idea that Cape Marina was in the "bullseye" of

the storm, explaining this was an incorrect interpretation of the weather report presented.  Tr. III, 60:25–61:13.  While some charts have a black line that indicates the possible path of a hurricane, Dr. Dooley clarified the area the line leads to will not necessarily be the exact center of the storm— a common misconception.  Tr. III, 60:25–61:13.

When pressed about whether he believed keeping the Serendipity within the Abacos increased the risk of damage, Dr. Dooley stated it did.  Tr. III, 76:5–16.  He opined that if the Serendipity left Treasure Cay before "late on the 30th" it would have been able to make a crossing to Florida.  Tr. II, 180:4–17; Tr. III, 76:5–16.  And Dr. Dooley indicated that while Cape Canaveral was close to the storm in one three-day forecast, it was his opinion that a person could reduce the risk of a vessel being destroyed by moving out of the immediate way of the hurricane, continuing to watch the forecast, and adapting where to bring the vessel as the storm develops.  Tr. III, 76:17–77:10.  In his estimation, there are "two ways" to control the risk of damage from a hurricane: "change where you are now or change where you're going to be."  Tr. III, 78:3–6.  Because hurricanes continually change paths, Dr. Dooley indicated it would be best to move as far out of the current path as possible and adapt as the forecast changes.  *See* Tr. III, 78:3–79:15. Accordingly, while Cape Canaveral might have appeared near the edge of the three-day forecast, it was still more prudent to evacuate to Cape Canaveral given that the Abacos was in the immediate path of the storm.

### ii.  Captain Thomas Danti

Finally, Defendant called Captain Thomas Danti as an expert witness.  Captain Danti is a highly qualified professional mariner who has extensive experience going to sea and has instructed students who desire to become full-time licensed captains.  Tr. III, 86:18–88:18.  When Captain Danti testified, he was the Dean of Instruction and an Instructor at the Chapman School of

Seamanship. *Id.* Captain Danti developed the school's hurricane plan. Tr. III, 96:3–97:3. His instruction at the Chapman School involves training students who plan to work as full-time captains on yachts or in the commercial marine industry. Tr. III, 95:3–15. The Court qualified Captain Danti as an expert in seamanship and navigation. Tr. III, 99:6–14.

As explained by Captain Danti, a full-time captain is an experienced individual who maintains the vessel.[4] Tr. III, 102:1–18. Captain Danti testified that a full-time captain would plan for the possibility of a storm when traveling to the Bahamas, which includes having a pre-planned place to bring the vessel to the United States in the event the Bahamas needs to be evacuated. Tr. III, 108:4–17, 109:8–110:1, 111:5–25, 124:16–25, 142:25–143:3. Having listened to Mr. Oakley's approach not to plan for a storm, Captain Danti stated that was not what a full-time captain would have done. Tr. III, 140:13–141:2. He explained that several factors make weathering a hurricane in the United States preferable to weathering it in the Bahamas, including the fact that Florida has more haul-out options, greater availability of salvage operations, and more places to bring a boat in the event the captain cannot haul it out of the water. Tr. III, 112:1–113:6. Captain Danti determined that Cape Marina, the Serendipity's home port, had the ability to haul vessels out and that a full-time captain would have secured a haul-out reservation prior to traveling to the Bahamas. Tr. III, 113:16–114:5, 116:1–5. This conclusion, however, was called into question on cross examination. Plaintiff's counsel raised the fact that Cape Marina only hauls twenty vessels out of the water and there is a waiting list to get a haul-out reservation, suggesting that Mr. Oakley could not, in fact, haul out at Cape Canaveral. Tr. III, 166:12–21. Nevertheless,

---

[4] The Court notes that Captain Danti believed the Captain Warranty required a captain who worked on the boat full time. *See* Tr. III, 158:11–25. The Eleventh Circuit held the Captain Warranty was ambiguous, but that Serendipity LLC breached any reasonable interpretation of the Captain Warranty. *Serendipity at Sea, LLC*, 56 F.4th at 1286–87. Because the Court finds that Captain Danti expressed dispositive opinions at trial that do not rely on this specific interpretation of the Captain Warranty, the Court need not consider the opinions that were premised on this interpretation.

Captain Danti maintained that a captain would have researched other places to bring the boat in the event a haul-out was not possible. Tr. III, 114:13–115:9.

Captain Danti unequivocally stated a full-time licensed captain would have made the decision to evacuate to the United States under the assumption that Dorian would become a hurricane. Tr. III, 118:1–5. In fact, it was Captain Danti's opinion that a full-time captain would have made that decision on approximately August 23rd or 24th. Tr. III, 123:1–5. At the very least, a captain would likely have begun to consider evacuating when Dorian was reported as a tropical storm. Tr. III, 132:7–133:1. And Captain Danti opined that, assuming the vessel was still in the Abacos, a full-time licensed captain would have made the decision to evacuate on August 28, 2019 given the weather conditions at the time. Tr. III, 133:23–135:15. Part of this assessment was due to Captain Danti's disagreement with the idea that Treasure Cay is a good hurricane hole. He testified that while this might be true when only looking to the Bahamas, it is a poor hurricane hole when compared to areas within the United States. Tr. III, 127:16–129:24. Captain Danti agreed with Dr. Dooley's assessment that a crossing from the Bahamas to the United States could have been made from August 25th to August 30th. Tr. III, 137:1–16. He also agreed with Dr. Dooley's AIS data, which showed vessels leaving Treasure Cay prior to the storm—consistent with his opinion that a captain would have evacuated Treasure Cay. Tr. III, 146:18–25.

## **FINDINGS OF FACT**

Based on the testimony summarized above, the Court makes the following dispositive findings of fact. In the summer of 2019, Oakley took his boat, the Serendipity, to Treasure Cay. Stip. ¶ 5(s). Before departing for this trip, Oakley bought several pieces of new equipment for the Serendipity, but he did not create a hurricane evacuation plan for the vessel, did not reserve a haul-out spot for the Serendipity, and did not consult a full-time licensed captain about the trip. *See,*

*e.g.*, Tr. I, 70:6–15, 137:19–20, 138:20–25, 139:1–10; Tr. II, 83:18–85:9, 86:19–87:14, 90:17–24. He left the Serendipity moored behind a residence in Treasure Cay known as the Pink Paradise and did not employ a captain to care for the Serendipity while it was moored there.  Stip. ¶ 5(o), (u)–(v).  Instead, Captain Trevor Lightbourne made himself available to do periodic visual checks of the Serendipity.  *See* Tr. I, 68:15–69:4.  But Lightbourne had obligations to other boats and was never able to evacuate Treasure Cay with the Serendipity if it needed to leave the Abacos.  Tr. II, 94:4–25, 103:8–14, 117:20–24.

By the week of August 26, 2019, it was clear from the available weather reports that Hurricane Dorian would, to some extent, affect the Abacos.  Tr. II, 171:5–172:1.  And by August 28, 2019, it was clear that Dorian would be near the Abacos as at least a Category 3 hurricane.  Tr. II, 175:12–17.  Meanwhile, the government of the Bahamas began to prepare for the storm by issuing multiple warnings to the public.  Tr. III, 7:3–25.  While the storm began to approach the Abacos, Oakley discussed what he should do about the Serendipity with both Captain Lightbourne and Captain Connelly.  Lightbourne and Connelly advised him to stay in Treasure Cay.  *See, e.g.*, Tr. I, 28:4–6, 112:6–17, 113:9–18.  Part of the motivation for these recommendations was the fact that Hurricane Dorian initially started out as a tropical storm.  *See id.*  But it is clear from the trial testimony that a significant factor in the decision to remain in Treasure Cay was that no hurricane evacuation plan existed for the Serendipity.  *See, e.g.*, Tr. I, 117:23–118:2, 119:10–14.

Compounding the lack of planning, there was no captain on the ground who could take the Serendipity out of Treasure Cay immediately.  Plaintiff only presented evidence regarding two possible people who could have taken the Serendipity out of the Abacos: Oakley and Captain Connelly.  Both Oakley and Connelly, however, would have to fly in to evacuate the Serendipity because neither of them were located in Treasure Cay during the week leading up to Hurricane

Dorian making landfall. *See, e.g.*, Tr. I, 92:8–16, 149:2–6. In the face of these alternatives, Oakley decided to leave the Serendipity tied to the dock behind the Pink Paradise. Ultimately, the Serendipity suffered a constructive total loss as a result of being in Treasure Cay when Hurricane Dorian struck the island.

This outcome would not have come to pass had Serendipity LLC employed a captain for the management and care of the Serendipity. As evidenced by Captain Danti's testimony, which this Court credits, a captain would have prepared for the uncertainty posed by a hurricane hitting the Abacos. Indeed, a licensed captain would have created a defined hurricane plan to follow prior to the vessel's trip to the Abacos. Tr. III, 108:4–17, 109:8–110:1, 111:5–25, 124:16–25, 142:25–143:3. And Defendant has proven by a preponderance of the evidence that a full-time licensed captain would have investigated haul-out options and other alternative places to keep the vessel in the event of a hurricane. *See, e.g.*, Tr. III, 113:16–114:5, 116:1–5, 114:13–115:9. Then, once Hurricane Dorian started to pose a risk to the Abacos, a captain would have taken the opportunity to evacuate. *See* Tr. III, 118:1–5, 133:23–135:15. In fact, the risk posed by the storm would have been perceived early enough to permit a full-time licensed captain to timely evacuate given that crossing was safe up through August 30, 2019. *See, e.g.*, Tr. III, 137:1–16. Simply put, based on Captain Danti's unrebutted testimony, a full-time licensed captain would have ensured the Serendipity was nowhere near Treasure Cay and the Pink Paradise when the storm hit. And if the Serendipity had not been at the Pink Paradise when Hurricane Dorian hit, damage to the vessel would have been avoided when the pilings it was tied to ultimately broke.

## CONCLUSIONS OF LAW

Florida's anti-technical statute provides that:

> A breach or violation by the insured of a warranty, condition, or provision of a wet marine or transportation insurance policy,

> contract of insurance, endorsement, or application does not void the policy or contract, or constitute a defense to a loss thereon, unless such breach or violation increased the hazard by any means within the control of the insured.

FLA. STAT. § 627.409(2).  This statute prevents "the insurer from avoiding coverage on a technical omission playing no part in the loss." *Pickett v. Woods*, 404 So. 2d 1152, 1153 (Fla. 5th DCA 1981).  "Whether an insured increased the hazard by noncompliance with a warranty 'is typically a question of fact[.]'" *Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 71 F.4th 894, 905 (11th Cir. 2023) (quoting *Serendipity at Sea, LLC*, 56 F.4th at 1290).  "[T]o meet its burden under Florida's anti-technical statute, the insured must show that, under the circumstances of the specific accident at issue, the breach of the warranty had some material effect on the loss." *Id.* at 906.

The Eleventh Circuit has already determined that Serendipity LLC breached the Captain Warranty.  *See Serendipity at Sea, LLC*, 56 F.4th at 1286–87.  Under the law-of-the-case doctrine, district courts "are bound by findings of fact and conclusions of law made by [the Court of Appeals] in an earlier appeal of the same case." *See Kelly v. Dun & Bradstreet, Inc.*, 641 F. App'x 922, 924 (11th Cir. 2016).  "[T]he only means by which the law-of-the-case doctrine can be overcome is if: (1) since the prior decision, 'new and substantially different evidence is produced, or there has been a change in the controlling authority'; or (2) 'the prior decision was clearly erroneous and would result in a manifest injustice.'" *This That & The Other Gift & Tobacco, Inc. v. Cobb Cnty.*, 439 F.3d 1275, 1283–84 (11th Cir. 2006) (quoting *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1288 (11th Cir. 2000)).  Here, none of the exceptions to the law-of-the-case doctrine apply.  Accordingly, the single issue before this Court is whether Serendipity LLC's breach of the Captain Warranty increased the hazard posed to the Serendipity by Hurricane Dorian.  The Court concludes that it did.

Based on this Court's findings of fact, it is clear that Serendipity LLC's failure to hire a full-time licensed captain increased the hazard that Serendipity would be destroyed by Hurricane Dorian. A full-time licensed captain would have created a detailed hurricane plan and evacuated the Abacos well in advance of the storm making landfall on Treasure Cay. With the Serendipity safely in the United States, the captain could then execute the remaining hurricane plan—namely, having the boat hauled out or traveling into an inland waterway. Of course, Captain Danti acknowledged that options within the United States were not guaranteed to ensure no damage to the Serendipity. *See, e.g.*, Tr. III, 112:5–14. But certainly, Defendant has carried its burden of proof to establish that the failure to hire a full-time licensed captain increased the hazard of the damage suffered here.

On appeal, Serendipity LLC noted five reasons why it believed its breach of the Captain Warranty did not increase the hazard. The Eleventh Circuit quoted these reasons:

> 1) two licensed captains were physically present with the Serendipity in the days leading up to Dorian hitting the Abaco; 2) Mr. Oakley was in regular communications with Captains McIntosh, Lightbourne and Connelly and the Cape Marina in the days and hours leading up to Dorian hitting the Abaco, and all determined that it was best to leave the Vessel where it was; 3) Captains McIntosh and Lightbourne secured the Vessel with assistance from crew, and Mr. Oakley observed and oversaw the process via live video camera; 4) Captain Lightbourne stayed in the Pink Paradise, therefore a licensed Captain *was* with the Vessel at the time Dorian hit; 5) the suggestion that anyone, given Dorian's record-breaking unpredictability, changing nature and wind velocity, would have been able to predict Dorian's path to avoid Dorian in the days leading up to August 30 is ludicrous.

*Serendipity at Sea, LLC*, 56 F.4th at 1290. Having heard extensive evidence on these issues, the Court finds that the record does not support any of Serendipity LLC's arguments.

*First*, there is no evidence that two licensed captains were physically present with the Serendipity in the lead up to Dorian. Captain McIntosh—one of the captains referenced—did not

testify at trial, and no witness made much, if any, reference to his involvement with the Serendipity. And while Captain Lightbourne was on Treasure Cay, the evidence shows that he prepared the Serendipity for the storm almost a week in advance and did not have any further involvement with caring for the Serendipity up to the time of the storm.  He was also unavailable to evacuate the Serendipity even in the event Mr. Oakley determined that the vessel should leave the island.

*Second*, while Oakley was in contact with Lightbourne, Connelly, and Cape Marina before Dorian made landfall, the Court has explained why it finds Captain Lightbourne and Connelly's opinions were influenced by the fact there was no pre-determined hurricane plan.

*Third*, while Captain Lightbourne prepared the Serendipity for the storm—and his lines held—it was the presence of the Serendipity in Treasure Cay behind the Pink Paradise that caused its constructive loss.  Therefore, Lightbourne's preparation was ultimately not the deciding factor in the loss.

*Fourth*, the Court has explained that Lightbourne was unable to evacuate Treasure Cay with the Serendipity, which was the crucial first step to take in this case in order to avoid the loss that transpired.  And the inability to leave Treasure Cay was fueled by the fact that Mr. Oakley had not formed a hurricane plan before Dorian arrived.

*Fifth*, while Hurricane Dorian's progression was—to an extent—unpredictable, this fails to save Serendipity LLC.  A full-time captain would have prepared for and worked around the unpredictability of a hurricane rather than simply failing to act.  While Dorian progressed quickly, the fact it would affect the Abacos to some extent was well-known before it was too late to evacuate the Serendipity.

Taken together, the evidence presented at trial shows, by a preponderance of the evidence, that the failure to employ a full-time licensed captain here increased the hazard to the Serendipity.

## <u>CONCLUSION</u>

Accordingly, the Court, having heard and carefully reviewed all the evidence introduced at trial—and having determined that Plaintiff's breach of the Captain Warranty increased the hazard in this case—it is hereby

**ORDERED AND ADJUDGED** that Final Judgment is entered in favor of Defendant, Underwriters at Lloyd's of London Subscribing to Policy Number 187581, and against Plaintiff, Serendipity at Sea, LLC.  Plaintiff shall take nothing by this action and Defendant shall go hence without day.  Further, the Court reserves jurisdiction to determine entitlement to and the amount of any attorneys' fees and costs.

**DONE AND ORDERED** in Miami, Florida, this 1st day of September, 2023.

_____
**RODOLFO A. RUIZ II
UNITED STATES DISTRICT JUDGE**